# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

MARCELLUS EDWARD CHEATHAM,)III,

      Movant,

      vs.

UNITED STATES OF AMERICA,

      Respondent.

)
)
)
)
)
)
)
)
)
)

CR NO. 4:12-cr-00111-HCM-LRL-1

## MOTION FOR COMPASSIONATE RELEASE PURSUANT TO
## 18 U.S.C. § 3582(C)(1)(A) AND FIRST STEP ACT OF 2018

COMES Movant, MARCELLUS EDWARD CHEATHAM, III ("Cheatham"), appearing *pro se,* and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Cheatham's health. The virus thrives in densely packed populations, and the FCI is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Cheatham. Cheatham's diagnosed medical conditions make him especially vulnerable to the deadly risks of COVID-19. Allowing Cheatham to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus.

# I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

# II. PROCEDURAL HISTORY

On March 11, 2013, a grand jury sitting in the United States District Court for the Eastern District of Virginia, Newport News Division, returned a five (5) count Superseding Indictment charging Cheatham. See Doc. 23.[1] Count 1s charged Cheatham with Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a). *Id.*

---

[1] "Doc." refers to the Docket Report in the United States District Court for the Eastern District of Virginia, Newport News Division, in Criminal No. 4:12-cr-00111-HCM-LRL-1, which is immediately followed by the Docket Entry Number.

Count 2s charged Cheatham with Brandishing a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A). *Id.* Count 3s charged Cheatham with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). *Id.* Count 4s charged Cheatham with Felon in Possession of Ammunition, in violation of 18 U.S.C. § 922(g)(1). *Id.* Count 5s charged Cheatham with Possession with Intent to Distribute Schedule II Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). *Id.* The Superseding Indictment also contained a Forfeiture Allegation, pursuant to 21 U.S.C. § 853. *Id.*

On May 14, 2013, a Plea Agreement Hearing was held and Cheatham entered a plea of guilty as to Counts 1s and 5s of the Superseding Indictment, without a written Plea Agreement. See Doc. 47. Voir Dire held on Counts 2s, 3s, and 4s of the Superseding Indictment.

On May 15, 2013, Count 3s was dismissed pursuant to Motion for Judgment of Acquittal and 2-day jury trial commenced as to Counts 2s and 4s. See Doc. 54.

On May 16, 2013, the grand jury returned a guilty verdict as to Cheatham on Counts 2s and 4s of the Superseding Indictment. See Doc. 55.

On January 23, 2014, Cheatham was sentenced to a total term of 235 months' imprisonment, 5 years Supervised Release, $2,895.58 Restitution, and a Mandatory Special Assessment Fee of $400. See Docs. 71, 72.

On February 6, 2014, Cheatham timely filed a Notice of Appeal. See Doc. 75.

On February 10, 2015, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") issued an Order affirming the judgment of the District Court. See Doc. 91.

On April 24, 2016, Cheatham filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"), which was denied on November 15, 2017. See Docs. 97, 122.

On January 9, 2018, Cheatham filed a Notice of Appeal re: denial of his § 2255 Motion. See Doc. 124. The Fourth Circuit dismissed his appeal on September 30, 2019. See Docs. 129, 130.

## III. DISCUSSION

As a preliminary matter, Cheatham respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. See *Clark v. Cartledge,* 829 F.3d 303 (4th Cir. 2016); *Estelle v. Gamble,* 429 U.S. 97 (1976) (same); and *Haines v. Kerner,* 404 U.S. 519 (1972) (same).

### A. <u>Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence</u>

This Court has the power to adjust Cheatham's sentence. District courts no

longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. § 3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

### 1. Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id.* at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id.* Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

### 2. Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an

extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

In 2007, the Sentencing Commission defined "extraordinary and compelling reasons" as follows:

> (A) Extraordinary and Compelling Reasons - Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the following circumstances:
>
> > (i) The defendant is suffering from a terminal illness.
> > (ii) The defendant is suffering from a permanent physical or medical condition, or is experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self care within the environment of a correctional facility and for which conventional treatment promises no substantial improvement.
> > (iii) The death or incapacitation of the defendant's only family member capable of caring for the defendant's minor child or minor children.
> > (iv) As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason for purposes of subdivision (1)(A). USSG §1B1.13, Application Note 1.

As we will see, with the passage of The First Step Act, subparagraph (iv) is no longer limited by what the BOP decides is extraordinary and compelling.

Historically, the BOP rarely filed motions under § 3582(c)(1)(A), even when the inmates met the objective criteria for modification. See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons Compassionate Release Program

(Apr. 2013). The Office of the Inspector General also found that the BOP failed to

provide adequate guidance to staff on the criteria for compassionate release, failed to

set time lines for review of compassionate release requests, failed to create formal

procedures for informing prisoners about compassionate release, and failed to generate

a system for tracking compassionate release requests. *Id.* at i-iv.

Congress heard those complaints and in late 2018 enacted The First Step Act.

### 3.    The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among

other things, transformed the process for compassionate release. Id. at §603. Now,

instead of depending upon the BOP to determine an inmate's eligibility for

extraordinary and compelling reasons and the filing of a motion by the BOP, a court

can resentence "upon motion of the defendant." A defendant can file an appropriate

motion if the he or she has exhausted all administrative remedies or "the lapse of 30

days from the receipt of such a request by the warden of the defendant's facility,

whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The purpose and effect of this

provision is to give federal courts the ability to hear and resentence a defendant even

in the absence of a BOP motion. Congress labeled this change "Increasing the Use and

Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018).

Senator Cardin noted in the record that the bill "expands compassionate release under

the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as ... improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

### 4. Cheatham Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

Cheatham filed a request for compassionate release to the FCI Pollock, Warden, but has not received a response to date. Because 30 days have lapsed from the receipt of the request, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

## B. Cheatham's Current Conditions of Confinement and Health Conditions

Cheatham, age 37, suffers from incurable, progressive disease, from which Cheatham will never recover, to wit: asthma and sinus bradycardia. He also suffers from low back pain, lumbago, opioid use disorder, dental caries, regular astigmatism, unspecified disease of nail, influenza-like illness, and pain in unspecified toe(s). See Exhibit 1.

### Facts:

***Asthma***. Asthma is a long-term disease of the lungs. You might hear your doctor call it a chronic respiratory disease. It causes your airways to get inflamed, narrow and swell, and produce extra mucus. This can make breathing difficult and trigger coughing, wheezing, shortness of breath, and chest tightness are classic asthma symptoms.

Asthma attacks can be fatal. A severe asthma attack can prevent you from getting enough oxygen into your lungs and can even stop your breathing. Therefore, severe asthma attack requires emergency medical attention.

***Bradycardia***. Bradycardia happens when your heart beats slower than normal. Your heart normally beats between 60 and 100 times per minute. Bradycardia is defined as a heart rate slower than 60 beats per minute.

Sinus bradycardia is a type of slow heartbeat that originates from the sinus node of your heart. Your sinus node is often referred to as your heart's pacemaker. It generates the organized electrical impulses that cause your heart to beat.

Sinus bradycardia and sinus arrhythmia can commonly occur during sleep. Sinus bradycardia can be a sign of a healthy heart. But it can also be a sign of a failing electrical system. For example, older adults may develop a sinus node that doesn't work to generate electrical impulses reliably or fast enough.

Sinus bradycardia can begin to cause problems if the heart isn't efficiently pumping blood to the rest of the body. Some possible complications from this include fainting, heart failure, or even sudden cardiac arrest.

***Influenza-Like Illness***. Influenza-like illness is a serious, contagious disease. It is spread by respiratory drops which occur when someone coughs, sneezes, or talks. It is also spread if someone touches something wet with respiratory droplets and then touches their eyes, nose, or mouth.

Influenza causes the abrupt onset of fever, all over body aches, and, sometimes, a dry cough, a mild runny nose, sore throat or nausea. Fever from influenza lasts from 3 to 7 days. During this time it is important that you isolate yourself to keep from spreading the infection to others. You should stay at home until you are fever-free for 24 hours without taking medicine. The flu leaves people feeling more easily fatigued than usual. Expect a day of recovery for every day of fever. The flu typically leaves people with a dry, irritating cough.

## *COVID-19*

COVID-19 has infected hundreds of prisoners and staff in city jails, state prisons and federal prisons.

New York, California and Ohio were among the first to release incarcerated people. Other states have followed, saying it is the only way to protect prisoners, correctional workers, their families and the broader community.

Jails and prisons often lack basic hygiene products, have minimal health care services and are overcrowded. Social distancing is nearly impossible except in solitary confinement, but that poses its own dangers to mental and physical health.

While there is absolutely no evidence to support that any person is more or less likely to be infected [with COVID-19] based on existing medical conditions, Cheatham's argues that, first, prisoners experience exponentially higher rates of COVID-19 than the general population. As of June 2020, "[t]he COVID-19 case rate for prisoners was 5.5 times higher than the US population case rate."[2] Second, and more critically, older individuals and individuals with chronic medical conditions are at greater risk of hospitalization and death from COVID-19. For example, the CDC reports that persons aged 40 to 49 are 15 times more likely to be hospitalized and 130 times more likely to die from COVID-19 compared to persons aged 18 to 29 and younger.[3] In other words, Cheatham does not only contend that his health conditions increase his risk of getting COVID-19; but also, he contends that those conditions greatly increase the risk that, if contracted, his COVID-19 infection would be severe or even deadly.

### _BOP Amid Covid-19_

One consequence of overcrowding is that prison officials have a difficult time

---

[2]
Brendan Saloner, _et al._, _COVID-19 Cases and Deaths in Federal and State Prisons_, J. of the Am. Med. Ass'n (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

[3]
_Hospitalizations & Death by Age_, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last updated May 14, 2021).

providing adequate health care.

In 2011 the U.S. Supreme Court ruled that overcrowding undermined health care in California's prisons, causing avoidable deaths. The justices upheld a lower court's finding that this caused an "unconscionable degree of suffering" in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

Amid a worldwide pandemic, such conditions are treacherous. Some of the worst COVID-19 outbreaks in U.S. prisons and jails are in places – like Louisiana and Chicago – whose prison health systems have been ruled unconstitutionally inadequate. Criminologists and advocates say many more people should be released from jails and prison, even some convicted of violent crimes if they have underlying health conditions.

The decision to release prisoners cannot be made lightly. But arguments against it discount a reality recognized over two centuries ago: The health of prisoners and communities are inextricably linked. Coronavirus confirms that prison walls do not, in fact, separate the welfare of those on the inside from those on the outside.

C.    **Cheatham Has "Extraordinary and Compelling Reasons" For Compassionate Release**

The principles of Compassionate Release allow for Cheatham's early release. As discussed above, the principles for release are no longer limited to BOP guidelines; federal courts have the power to determine what constitutes extraordinary and

compelling circumstances.

1. COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Cheatham.

The COVID-19 pandemic continues to roil the United States. As of April 29, 2021, the BOP has 126,247 federal inmates in BOP-managed institutions and 13,636 in community-based facilities. The BOP staff complement is approximately 36,000. There are 352 federal inmates and 815 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been 234 federal inmate deaths and 4 BOP staff member deaths attributed to COVID-19 disease. See https://www.bop.gov/coronavirus/ (last accessed April 29, 2021). Bottom line, Federal facilities are not immune.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is

increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

2. Martin's Vulnerability to COVID-19 Due to His High Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.

Cheatham is particularly vulnerable to COVID-19 because of his asthma, sinus bradycardia, influenza-like illness, and opioid use disorder. At the time of sentencing, the Court could not have anticipated that Cheatham's diseases will place him in the

"high risk" category nor the existence of the COVID-19. As the COVID-19 pandemic continues, it potentially poses a particular issue for older people and people with pre-existing medical conditions (such as serious heart condition, lung disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the COVID-19 virus.

### *Lung Problems, Including Asthma*

COVID-19 targets the lungs, so you're more likely to develop severe symptoms if you have preexisting lung problems, such as: Moderate to severe asthma, Chronic obstructive pulmonary disease (COPD), Lung cancer, Cystic fibrosis, Pulmonary fibrosis. In addition to being an asthma trigger, smoking or vaping can harm your lungs and inhibit your immune system, which increases the risk of serious complications with COVID-19.

### *Heart Disease, Diabetes and Obesity*

People with diabetes, heart disease, high blood pressure or severe obesity are more likely to experience dangerous symptoms if infected with COVID-19. This may be of particular concern in the United States, which has seen increasing rates of obesity and diabetes over the years.

Obesity and diabetes both reduce the efficiency of a person's immune system. Diabetes increases the risk of infections in general. This risk can be reduced by keeping blood sugar levels controlled and continuing your diabetes medications and insulin. Your risk of serious illness may also be higher if you have heart diseases such as cardiomyopathy, pulmonary hypertension, congenital heart disease, heart failure or coronary artery disease.

Hence, it is appropriate for Cheatham to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of

us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

**Note:** According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

a.  Based on what we know now, those at high-risk for severe illness from COVID-19 are:
- People 60 years and older
- People who live in a nursing home or long-term care facility

b.  People of all ages with underlying medical conditions, particularly if not well controlled, including:
- Cancer
- Chronic kidney disease
- Chronic lung diseases, including COPD (chronic obstructive pulmonary disease), asthma (moderate-to-severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension
- Dementia or other neurological conditions
- Diabetes (type 1 or type 2)
- Down syndrome
- Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension)
- HIV infection
- Immunocompromised state (weakened immune system)
- Liver disease
- Overweight and obesity
- Pregnancy

- Sickle cell disease or thalassemia
- Smoking, current or former
- Solid organ or blood stem cell transplant
- Stroke or cerebrovascular disease, which affects blood flow to the brain
- Substance use disorders

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Cheatham's high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like FCI to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Cheatham suffers from ailments that have already been identified as "high risk," this Court should find that

Cheatham's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few months, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the

incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

### 3. Courts Have Granted Compassionate Release in Light of the Instant Pandemic.

Courts in the Southern and Eastern Districts of New York have granted compassionate release based on COVID-19. See *United States v. Wilson Perez*, No. 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, (granting release based on health issues and finding court could waive exhaustion requirement; government did not object based on defendant's medical conditions); *United States v. Mark Resnick*, No. 12 Cr. 152 (CM) (S.D.N.Y. April 2, 2020), ECF No. 461 (granting compassionate release because of defendant's age and medical conditions in light of COVID-19); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020), ECF No. 108 (granting compassionate release motion, where government consented, because of defendant's age and medical conditions and the risk posed by COVID-19); *United*

*States v. Damian Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1

(S.D.N.Y. Mar. 27, 2020) (granting compassionate release sentencing reduction to

defendant convicted of firearms offenses based on defendant's health and threat he

faced from COVID-19; government consented to reduction and agreed health issues

and COVID-19 were basis for relief); *United States v. Daniel Hernandez*, No. 18 Cr.

834 (PAE) (S.D.N.Y. Apr. 1, 2020), ECF No. 446 (granting compassionate release

after BOP denied the request and converting remaining sentence to home confinement).

So, too, have courts across the country. See *United States v. Andre Williams*,

No. 04 Cr. 95 (MCR) (N.D. Fla. Apr. 1, 2020) (granting release based on defendant's

health and COVID-19); *United States v. Teresa Ann Martin*, No. 18 Cr. 232 (TOR)

(E.D. Wa. Mar. 25, 2020), ECF No. 834 (waiving any further exhaustion attempts as

futile and granting compassionate release based on defendant's health issues and

COVID-19 pandemic); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB) (E.D.

Pa. Apr. 1, 2020), ECF No. 135 (finding court has independent authority to determine

"extraordinary and compelling" reasons and granting compassionate release based in

part on defendant's health and COVID-19; no exhaustion issue because 30 days had

passed); *United States v. Pedro Muniz*, No. 09 Cr. 199 (S.D. Tex. Mar. 30, 2020), ECF

No. 578 (granting compassionate release based on health conditions that made inmate

susceptible to COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH)

(D.D.C. Mar. 27, 2020), ECF No. 97 (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's emergency motion based on COVID-19); *US v. Foster*, No. 1:14-cr-324-02 (M.D. Pa. Apr. 3, 2020) ("The circumstances faced by our prison system during this highly contagious, potentially fatal global pandemic are unprecedented. It is no stretch to call this environment 'extraordinary and compelling,' and we well believe that, should we not reduce Defendant's sentence, Defendant has a high likelihood of contracting COVID-19 from which he would "not expected to recover." USSG §§ 1B1.13. No rationale is more compelling or extraordinary."); *US v. Powell*, No. 1:94-cr-0316-ESH (D.D.C. Mar. 24, 2020), Recommendation, Dkt. 94 (Court recommendation to BOP to immediately place defendant, who is 55-years old and suffers from several respiratory problems (including asthma and sleep apnea) into home confinement to serve the remainder of his prison term); *United States v. Reed*, No. 9-cr-160 (PAM/AJB), 2020 WL 3960251, at *1-2 (D. Minn. July 13, 2020) (granting compassionate release, in part, because inmate suffered from asthma, further noting that "asthma is the second most common comorbidity among individuals between ages of 18 and 49 who are hospitalized for COVID-19 complications").

4.    924(c) Consecutive Sentence

18 U.S.C. § 924(c) creates a substantive offense for possessing or using a firearm during, or in furtherance of, a "crime of violence." The statute defines "crime of violence" as an offense that either: (1) has as an element the use, attempted use, or threatened use of physical force; or (2) is a felony that, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The § 924(c) definition of "crime of violence" is copied verbatim from 18 U.S.C. § 16, which provides the general definition for "crime of violence" under federal law.

The parallels between "violent felony" and "crime of violence" are immediately apparent.

- First, because the residual clause defining "crime of violence" begins with the phrase: "by its nature," it tells us that deciding whether a given crime is a "crime of violence" under § 924(c) must use the "ordinary case" method, just like with ACCA.

- Second, because the residual clause defining "crime of violence" asks us to look at whether there is a "substantial risk that physical force...may be used," this is no more precise than the "serious potential risk of physical injury" standard under ACCA.

In *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), the Supreme Court, applying its earlier decision in *Johnson*, held that the residual (or "risk of force") clause found in 18 U.S.C. § 16(b), as used in the Immigration and Nationality Act's ("INA") definition

of "aggravated felony," 8 U.S.C. § 1101(a) (43) (F), is unconstitutionally vague in violation of the Due Process Clause. See also, *Dimaya*, 138 S. at 1213 ("*Johnson* is a straightforward decision, with equally straightforward application here.").

Section 16(b) and § 924(c)(3)(B) of Title 18 are "virtually identical." *United States v. Acosta*, 470 F.3d 132, 135-36 (2d Cir. 2006) ("§ 16 [is] a provision which contains virtually identical language to § 924(c)(3)."). Compare 18 U.S.C. § 16(b)(defining "crime of violence" as "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.") with § 924(c)(3)(B) (defining "crime of violence" as "an offense that is a felony and that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.").

In light of *Dimaya*, Cheatham's conviction for possessing a firearm during a crime of violence, see 18 U.S.C. § 924(c)—i.e., 18 U.S.C. § 1951–Interference with Commerce by Threat or Violence (Hobbs Act robbery), must be vacated because § 924(c)(3)(B) is unconstitutionally vague. The Fifth Amendment's proscription against depriving an individual of life, liberty, or property without due process of law supplies the rationale for the void-for-vagueness doctrine. Under it, the government may not impose sanctions "under a criminal law so vague that it fails to give ordinary people fair

notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Welch v. United States*, 136 S. Ct. 1257, 1262 (2016)(quoting *Johnson*, 135 S. Ct. at 2556).

In this case, Cheatham's sentence for use of a weapon during a crime of violence, in violation of 18 U.S.C. § 924(c), is now unconstitutionally imposed where the factual basis of the conviction is now insufficient because the charged predicate offense of federal Hobbs Act Robbery is not categorically a crime of violence under either the use-of-force clause or the residual clause of 18 U.S.C. §924(c)(3).

Cheatham was convicted on Counts 1s and 2s under 18 U.S.C. §§ 1915 and 924(c), which provides enhanced punishment for any person who discharges a firearm "during and in relation to any crime of violence" that is itself a violation of federal law. Under this statute, a "crime of violence" is defined as a felony that either: (A) "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (the "use-of-force clause"); or (B) "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (the "residual clause"). 18 U.S.C. § 924(c)(3)(A) & (B). In the instant case, the charged predicate offense is federal Hobbs Act Robbery, 18 U.S.C. § 1915.

In light of *Dimaya,* Hobbs Act robbery no longer qualifies as a crime of violence

under either the use-of-force clause or the residual clause of § 924(c)(3). Hobbs Act robbery categorically fails to qualify as a crime of violence under the use-of-force clause because it can be committed without physical force or the threatened deployment of the same and because it can be accomplished by mere "intimidation," which does not require the intentional use or threat of use of violent physical force for two reasons. First, this Court's precedent establishes that intimidation is the threatened infliction of bodily injury, which is not equivalent to the threatened use of force. Second, precedent requires that a use or threat of use of force be intentional, but intimidation may occur even if the defendant did not intend to make a threat. And Hobbs Act robbery cannot qualify as a "crime of violence" under § 924(c)(3)'s residual clause, because, under the reasoning of *Johnson* and *Dimaya* that clause is void for vagueness under the Due Process Clause of the Fifth Amendment.

Because Hobbs Act robbery is not a qualifying "crime of violence" predicate, the factual basis of the conviction admits to conduct that legally does not satisfy every element of the charged statute. A guilty verdict to a non-existent offense obviously affected both Cheatham's substantial rights, as well as the fairness, integrity, or public reputation of the proceedings.

### D.   Recidivism Risk Level

In his 100 months of imprisonment, Cheatham has matured from a rash young

adult pursuing a lawless lifestyle, to a reflective, empathetic matured responsible middle-aged adult. According to the Overview of Federal Criminal Cases published by the United States Sentencing Commission for the fiscal year of 2020, the average sentence imposed for murder is 255 months, just twenty months less than Cheatham's sentence for robbery. U.S. SENTENCING COMM'N, OVERVIEW OF FEDERAL CRIMINAL CASES, FISCAL YEAR 2020, at 9 (2021). However, Cheatham was not sentenced for murder, but rather for robbery. He was 25 years old when he committed the instant offense, thus he has served more than one-fourth of his life behind bars. This is significant punishment for his robbery, depriving him of "the family life" that he "cherish[es] more than anything."

Cheatham urges the Court to consider the following *Redd* case citations:

- *United States v. Sain*, Case No. 07-20309 (E.D. Mich. Oct. 6, 2020) quoting *United States v. Redd*, 444 F. Supp. 3d 717, 729 (E.D. Va. 2020) (finding sentence reduction proper where inmate "demonstrated a commitment to self-improvement, devoting hundreds of hours to vocational programs, assisting others in their rehabilitative efforts, exhibiting solid work habits, caring for mental health inmates, and in the process exceeding his supervisor's expectations across most, if not all, areas of work"); *United States v. Parker*, No. 98-CR-00749, 2020 WL 2572525, at *11 (C.D. Cal. May 21, 2020) (collecting cases).

- *United States v. Goldberg*, Criminal Action No. 12-180 (BAH) (D.D.C. Apr. 13, 2020) quoting *United States v. Redd*, No. 1:97-cr-6, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) (finding that courts may consider "extraordinary and compelling

reasons based on facts and circumstances other than those set forth in U.S.S.G. §1B1.13 cmt. n.1(A)-(C)"); *United States v. Young*, No. 2:00-cr-2, 2020 WL 1047815, at \*6 (M.D. Tenn. Mar. 4, 2020) ("[D]istrict courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release."); *United States v. Maumau*, No. 2:08-cr-758, 2020 WL 806121, at \*4 (D. Utah Feb. 18, 2020) (concluding that the court "has the discretion to provide [the defendant] with relief, even if his situation does not fall directly within the Sentencing Commission's current policy statement.")

- *United States v. Harpine*, Case No. 6:91-cr-60156-MC (D. Or. Mar. 27, 2020) quoting *United States v. Redd*, No. 1:97-cr-00006-AJT, 2020 WL 1248493, at \*10 (E.D. Va. Mar. 16, 2020) (granting compassionate release after recognizing "overwhelmingly positive" prison conduct that was "reflective of substantial rehabilitation"); *United States v. Davis*, No. PJM 00-424-2, 2020 WL 1083158, at \*2 (D. Md. Mar. 5, 2020) (granting compassionate release and specifically recognizing that the defendant "has been incarcerated for close to twenty years without a single disciplinary infraction"); *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at \*3 (D. Kansas Mar. 11, 2020) (granting compassionate release based on time served and good conduct).

- *United States v. Clark*, Case No. 11-CR-30-2-JPS (E.D. Wis. Jul. 23, 2020) quoting that in *Redd*, the Court evaluated whether extraordinary and compelling reasons existed to reduce the sentence by considering (1) the sentence the defendant originally received compared to the one he would receive today; (2) the disparity between those sentences; and (3) the reason for that disparity. *Redd*, 2020 WL 1248493, at \*5. There, the court determined that the disparity was "primarily the result of Congress' conclusion that sentences like [defendant's] are unfair and unnecessary." *Id.* at \*6.

- *United States v. Brooks*, Case No. 07-cr-20047-JES-DGB (C.D.

Ill. May. 15, 2020) quoting that in *Redd*, the district court held "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) and that the reasons it has determined in this case constitute extraordinary and compelling reasons warranting a sentence reduction satisfy any requirement for consistency with any applicable policy statement."

And

- *United States v. Crowe*, 980 F.3d at 1102 n.6 (holding that inmate's prior exposure to tuberculosis "could be considered an extraordinary and compelling reason for compassionate release" because it "put him at risk of contracting the virus" or "serious long-term health problems" if he had already contracted it). Courts considering the issue post-*Jones* have agreed. See, e.g., *United States v. Rucker*, No. 17-20716, 2020 WL 7240900, at *2 (E.D. Mich. Dec. 9, 2020) (HIV and asthma) (citing *Jones*, 980 F.3d at 1102 n.6); *United States v. White*, No. 18-20183, 2020 WL 7240904, at *3 (E.D. Mich. Dec. 9, 2020) (BMI of 45.9) (citing *Jones*, 980 F.3d at 1102 n.6); *United States v. Crowe*, No. CR 11-20481, 2020 WL 7185648, at *3 (E.D. Mich. Dec. 7, 2020) (latent tuberculosis, hyperlipidemia, obesity).

- Section 1B1.13 has not been updated to reflect pursuant to the 2018 First Step Act, hence, defendants now have the ability to bring such motions directly. This anomaly has given rise to a debate concerning whether and to what extent § 1B1.13 applies to motions filed by defendants, with several circuits recently holding that § 1B1.13 applies only to motions filed by the Bureau of Prisons, and not to motions filed by defendants on their own behalf. See *United States v. McCoy*, Nos. 20-6821, 20-6869, 20-6875, 20-6877, 2020 WL 7050097, at *6-7 (4th Cir. Dec. 2, 2020); *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *8-9 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020); *United*

29

*States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020).

It is also essential to note that at sentencing, Judge Shapiro complained aloud that a life sentence was too harsh for Cheatham's March 6, 1998, robbery of $6,694 from the United Bank branch on Girard Avenue near 29th Street. See Exhibit 4. Cheatham's sentencing guidelines called for a prison term in the 20-year range, and that would have been "more adequate" to cover the bank robbery. *Id.* It's questionable social policy," she said of the three-strike law. The Judge also said it was "wrong" of the law-enforcement authorities to use the federal courts to put Cheatham away for life for a bank robbery because they "think" the seven years he served for murder was inadequate punishment. *Id.*

Factoring in Cheatham's medical condition, maturity, and rehabilitation, his continued risk to the public if released appears to be markedly reduced as recidivism declines with age, particularly when tempered by significant rehabilitation. Cheatham is now 34 years old, making him substantially less likely to recidivate than a younger offender. To date, he has served 100 months in BOP custody. Given the length of his imprisonment, his personal rehabilitation, and deeply felt remorse, the Court must conclude that deterrence and public protection are no longer strong § 3553(a) factors weighing in favor of continued detention.

Under 18 U.S.C. § 3582(c)(2), to modify Cheatham's sentence, taking into

account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Additionally, Cheatham also contends that evidence of his post-sentencing rehabilitation warrants a reduction. See Exhibit 2. Cheatham's sentence would result in unwarranted sentencing disparities among similarly situated defendants. More so, his BOP record does not show that he is violent or a threat to public safety. This sentence also avoids unwarranted sentencing disparities.

If granted compassionate release, Cheatham will reside with his family— where he will be able to isolate himself and take the same precautionary measures that all Americans are taking: frequent hand washing, sanitizing his living space, and seeking medical care if necessary. None of these precautions are available in prison. Further information about these release plans upon request.

Finally, the combination of factors, health conditions, COVID-19 risk, as well as length of time already served, post-sentencing rehabilitation, and the changing sentencing landscape justify granting compassionate release to Cheatham. Else, it

would result in unwarranted sentencing disparities among similarly situated defendants. More so, his BOP record does not show that he is violent or a threat to public safety.

## IV. CONCLUSION

For the above and foregoing reasons, Cheatham prays this Court would consider his Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018, based upon the "extraordinary and compelling reasons" and release him to home confinement.

Respectfully submitted,

Dated: June 18, 2021

_____
MARCELLUS EDWARD CHEATHAM, III
REG. NO. 34952-183
FCI POLLOCK
FEDERAL CORR. INSTITUTION
P.O. BOX 4050
POLLOCK, LA 71467

## CERTIFICATE OF SERVICE

I hereby certify that on June ___, 2021, I mailed a true and correct copy of the above and foregoing Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018 via U.S. Mail, postage prepaid, to Kenneth P. Kaplan, Assistant U. S. Attorney at U.S. Attorney's Office (Newport News-NA), 721 Lakefront Commons, Suite 300, Newport News, VA 23606.

_____
MARCELLUS EDWARD CHEATHAM, III