**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 4:12cr111 |
| | ) | |
| MARCELLUS CHEATHAM, III | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION FOR COMPASSIONATE RELEASE**
**PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) WITH MEMORANDUM OF LAW**

Marcellus Cheatham III, by counsel, respectfully asks this Court to reduce his custodial

sentence under 18 U.S.C. § 3582(c)(1)(A)(i) for extraordinary and compelling reasons. Mr. Cheatham

is disproportionately at risk of suffering from complications resulting from COVID-19. Mr.

Cheatham's moderate-to-severe asthma, combined with his remarkable commitment to rehabilitation,

his children's need for their father, and the need to correct sentencing disparities amidst a global

pandemic, justify granting compassionate release. In support, Mr. Cheatham submits the following.

**FACTUAL BACKGROUND**

Mr. Cheatham was named in a five-count indictment returned by an Eastern District of

Virginia Grand Jury on March 11, 2013. Count One charged him with Interference with Commerce

by Robbery, in violation of 18 U.S.C. 1951(a). Count Two charged him with Brandishing a Firearm

During a Crime of Violence, in violation of 18 U.S.C. 924 (c)(1)(A). Counts Three and Four charged

him with Felon in Possession of a Firearm, in violation of 18 U.S.C. 922(g)(1). Count Five charged

him with Possession with Intent to Distribute Schedule II Controlled Substance, in violation of 21

U.S.C. 841(a)(1) and (b)(1)(C).

On May 14, 2013, Mr. Cheatham entered a plea of guilty as to Counts 1 and 5 of the

indictment. On May 15, 2013, Count 3 was dismissed and a jury trial commenced as to Counts 2 and

4. On May 16, 2013, the jury returned guilty verdicts for Counts 2 and 4. On January 23, 2014, Mr. Cheatham was sentenced to 235 months' imprisonment (151 months on Counts 1 and 5 to run concurrently, plus 84 months consecutive on Count 2), to be followed by a total of five years' supervised release. Mr. Cheatham is currently incarcerated at FCI Pollock, located in Pollock, Louisiana. Having been incarcerated for 107 months, he has served approximately 45 percent of his 235-month sentence, accounting for good time credit.

## LEGAL BACKGROUND

In December 2018, President Trump signed the First Step Act of 2018 into law. Pub. L. 115-391, 132 Stat. 5194. Prior to the Act's passage, Congress had tasked the Bureau of Prisons with bringing "extraordinary and compelling" cases to the district court for adjudication under § 3582(c)(1)(A). Under the First Step Act, Congress amended § 3582(c)(1)(A) to (1) remove the Bureau of Prisons from its former role as a gatekeeper with respect to compassionate release petitions and (2) authorize defendants to file motions for sentence modifications on their own behalf, so long as they first apply to the BOP. *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). The purpose of Section 603(b) of the First Step Act was to "Increas[e] the Use and Transparency of Compassionate Release," and "*expand[] the discretion of the courts to consider leniency.*" *Id.* (internal citations and punctuation omitted) (emphasis added).

The relevant[1] provisions of 18 U.S.C. § 3582(c)(1)(A) now provide that:

**(c) MODIFICATION OF AN IMPOSED TERM OF IMPRISONMENT. —** The court may not modify a term of imprisonment once it has been imposed except that—

**(1)** in any case—

**(A)** the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring

---

[1] Subsection (ii), which applies only to defendants who are "at least 70 years of age, [and] ha[ve] served at least 30 years in prison," does not apply in this case. Rather, the request for a reduction in sentence is brought under § 3582(c)(1)(A)(i).

a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

**(i)** extraordinary and compelling reasons warrant such a reduction; . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).

However, the Fourth Circuit has held that "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *United States v. McCoy*, 981 F.3d 271, 283 (4th Cir. 2020). The First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Accordingly, it is the Court, not BOP, that determines whether there are extraordinary and compelling reasons warranting relief under 18 U.S.C. § 3582(c)(1)(A). *Id.* at 284. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *United States v. Brooker*, 976 F.3d 228, 236 (2d. Cir. 2020)

Therefore, the Court determines three things for a § 3582(c)(1)(A) motion filed by a defendant: *first*, whether he has satisfied § 3582(c)(1)(A)'s nonjurisdictional 30-day exhaustion provision (or whether the government has waived exhaustion); *second*, whether there are "extraordinary and compelling reasons" to reduce the sentence; and *third*, whether a sentence reduction is consistent with the § 3553(a) factors.

**ARGUMENT**

**I.    The Court Has Jurisdiction to Grant Mr. Cheatham's Immediate Release or Impose a Sentence Reduction.**

Section 603 of the First Step Act amended 18 U.S.C. § 3582(c)(1)(A) to authorize defendants to file their own motions for reduced sentences with the district court when one of two circumstances are met: 1) "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or 2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A) (2018). District courts are authorized to grant sentence reductions for "extraordinary and compelling reasons," if consistent with the § 3553(a) factors. 18 U.S.C. §§ 3852(c)(1)(A)(i), 3582(c)(1)(A).

Mr. Cheatham submitted a request for compassionate release to the warden of F.C.I. Pollock on June 22, 2021, and his request was denied on July 9, 2021. *See* Exhibit A—Compassionate Release Response. Because Mr. Cheatham submitted his request for compassionate release more than 30 days ago, he has satisfied § 3582(c)(1)(A)'s 30-day exhaustion provision, and his motion is properly before the Court now for a determination on the merits.[2]

---

[2] *See, e.g.*, Order, *United States v. Banks,* No. 20-7678, Dkt. No. 9-1 (4th Cir. Dec. 9, 2020) (granting joint motion to remand and vacating decision finding that Banks had not exhausted his administrative remedies); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("[p]risoners who seek compassionate release have the option to take their claim to federal court within 30 days, *no matter the appeals available to them*.") (emphasis added); *United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) ("the statute states that the defendant may file the motion thirty days after the warden receives his request."); *United States v. Brooker*, 976 F.3d 228, 236 (2d. Cir. 2020) ("After watching decades of the BOP Director's failure to bring any significant number of compassionate release motions before the courts, Congress allowed people seeking compassionate release to avoid BOP if BOP rejects their motions or fails to act on them *within a short time period, only 30 days*.") (emphasis added).

## II. There Are Extraordinary and Compelling Reasons for Compassionate Release.

The COVID-19 pandemic has wreaked havoc within the Bureau of Prisons. Mr. Cheatham is an African-American male, currently incarcerated, with moderate-to-severe asthma. The CDC recognizes that because of his underlying medical condition, Mr. Cheatham could face an increased risk of severe adverse consequences from COVID-19. Several courts have released defendants in recognition of the dangerousness of COVID-19 in carceral settings.[3] COVID-19 is an extremely dangerous and contagious virus that can even cause harm to otherwise young and healthy individuals. In addition, the COVID-19 pandemic, which has caused BOP prisons to operate on a lockdown status for the past year while inmates have faced increased exposure to the virus, has increased the severity of Mr. Cheatham's sentence in a way that could not have been anticipated when he was sentenced prior to the outbreak of COVID-19. The emergence of the Delta variant makes his vulnerability all the more urgent.

### A. Mr. Cheatham faces increased risk by virtue of his incarceration at F.C.I. Pollock

As of July 29, 2021, the CDC has updated its guidance to provide additional information about variants of the COVID-19 virus, particularly the Delta variant.[4] At this point, the CDC reports that

---

[3] *United States v. Kelly*, 13-CR-59-CWR-LRA, Dkt. No. 145 (S.D. Miss. May 1, 2020) (granting compassionate release to an individual in his late 20s without health issues, where BOP failed to control the outbreak of COVID-19 at his facility); *United States v. Chestnut*, 09-CR-06071-DGL-MWP, Dkt. Nos. 922, 925 (W.D.N.Y. Apr. 29, 2020) (granting compassionate release request despite the fact that Mr. Chestnut was not vulnerable based on a compromised immune system or pre-existing medical condition); *United States v. Vazquez*, 18-CR-20530-Ungaro, Dkt. No. 924, at *1 n.1 (S.D. Fla. Apr. 13, 2020) (recommending to BOP that the defendant serve his remaining sentence on home confinement where the defendant was in his late 30s and did not claim to suffer from any health condition that increased his risk of illness from COVID-19); *United States v. Stephens*, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (releasing defendant who had previously been detained for his alleged violation of supervised release in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" and the heightened risk of contracting COVID-19 faced by incarcerated individuals generally, even though the defendant had not alleged any individual vulnerability to COVID-19 other than his being incarcerated.).

[4] *See* CDC, *About Variants of the Virus that Causes COVID-19*, available at: https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html (last updated July 29, 2021).

scientists are still learning about COVID-19 variants – how easily they spread, whether they could cause more severe illness, and whether currently authorized vaccines will protect people against these variants.[5]  What *is* known is that the identified variants "seem to spread more easily and quickly than other variants, which may lead to more cases of COVID-19."[6]  The *Virginian-Pilot* reports that the Delta variant is driving a surge in cases—in Virginia and throughout the United States.[7]  "Studies show that, in rare instances, the delta variant is even capable of infecting vaccinated people, who can then spread it to others."[8]  In the wake of increased transmission, experts are warning that "[t]he COVID-19 pandemic is far from over."[9]

    As the Delta variant spreads in the United States, the CDC warns that getting vaccinated is "more urgent than ever," and has since updated its guidance for fully vaccinated people based on new evidence pertaining to the Delta variant.  For instance, to maximize protection from the Delta variant and prevent possibly spreading it to others, the CDC advises that even fully vaccinated people should wear a mask indoors if the individual is in an area of substantial or high transmission.[10] People with underlying medical conditions or who are taking medications that weaken the immune system are still advised to continue to take all precautions recommended for unvaccinated people, since they may not be protected even if fully vaccinated.[11]

---

[5] *Id.*

[6] *Id.*

[7] Elisha Saunders, *Child dies of coronavirus complications in Eastern Virginia, health department confirms*, The Virginian-Pilot (Aug. 5, 2021), available at: https://www.pilotonline.com/news/health/vp-nw-coronavirus-eastern-virginia-child-death-20210805-ihauizcguvbz5h3ucsevczgp5e-story.html.

[8] *Id.*

[9] *Id.*

[10] CDC, *When You've Been Fully Vaccinated*, available at: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last updated July 27, 2021).

[11] *Id.*

Unfortunately, outbreaks of COVID-19 are continuing to occur, despite vaccination efforts. Following the Fourth of July, a troubling outbreak occurred in Cape Cod, Massachusetts, whereby hundreds of people reported symptoms of COVID-19, despite the fact that many had been fully immunized.[12] What is different is that the Delta variant is known for its "hyper-transmissibility": "When a vaccinated person gets infected with delta—called a 'breakthrough infection'—the level of virus in their nasopharynx is about 1,000 times higher than with the alpha variant," Dr. Fauci has explained.[13] CDC Director Rochelle Walensky reports that some vaccinated people infected with the delta variant after vaccination may be contagious and spread the virus to others, stating that "[t]his new science is worrisome and unfortunately warrants an update to our recommendation."[14]

As of July 20, 2021, the more contagious Delta variant of the coronavirus now makes up for 83 percent of sequenced samples in the United States, amounting to a dramatic increase, up from 50 percent, for the week of July 3, 2021.[15] Despite the availability of the vaccine, vaccination rates in the country have stalled, as less than half of the United States population is fully vaccinated.[16] If many of those who are holding out do not get vaccinated, Dr. Fauci warns that the United States can expect a "smoldering" outbreak for "a considerable period of time."[17]

---

[12] Anne Flaherty and Arielle Mitropoulos, *CDC mask decision followed stunning findings from Cape Cod beach outbreak*, ABC News, available at: https://abcnews.go.com/Politics/cdc-mask-decision-stunning-findings-cape-cod-beach/story?id=79148102 (July 29, 2021).

[13] *Id.*

[14] *Id.*

[15] Madeline Holcombe, *More infectious Delta variant makes up 83% of new US coronavirus cases as vaccine hesitancy persists*, CNN Health, available at: https://www.cnn.com/2021/07/20/health/us-coronavirus-tuesday/index.html (July 20, 2021).

[16] *Id.*

[17] *Id.*

On July 22, 2021, the White House released a report detailing the detection and mitigation efforts of COVID-19 in correctional facilities nationwide.[18] The report found that by mid-December 2020, one in five state and federal prisoners in the United States had tested positive for COVID-19—a rate more than four times higher than the general population.[19] "Additionally, COVID-19 infections in confinement facility staff have significantly hampered operations of the facilities and services to residents/detainees/inmates."[20] Further, as states begin to reopen their facilities, mitigation of new transmission of COVID-19 must be addressed.[21] In order to mitigate the impact of COVID-19, the Guidance suggests, among other things, that correctional facilities undertake policies to reduce populations in confinement and divert individuals from confinement.[22]

Given the still-present risk of COVID-19, courts are continuing to grant compassionate release to high-risk individuals, regardless of whether they have been vaccinated. *See, e.g., United States v. Palmer*, Case No. 8:13cr623, ECF No. 142, at *6 (D. Md. July 29, 2021) (granting compassionate release to an inmate with sickle cell disease, deep vein thrombosis, and pulmonary embolism, despite the fact that he had received both doses of the COVID-19 vaccine, reasoning that while "[v]accines are effective at preventing COVID-19," . . . "effectiveness is not guaranteed," "there are unknowns regarding the extent and duration of the vaccine's protection," and "there may still be concern for particular individuals' increased risk of severe illness, even if fully vaccinated."). Indeed, as recently as August 3, 2021, two federal inmates died of COVID-19: One inmate initially tested positive on March

---

[18] *See Detection & Mitigation of COVID-19 in Confinement Facilities Guidance*, available at: https://www.cdc.gov/ncezid/dpei/pdf/guidance-detection-mitigation-covid-in-confinement-facilities-508.pdf.

[19] *Id.* at 2.

[20] *Id.*

[21] *Id.*

[22] *Id.* at 7-8.

30, 2021, and the other inmate initially tested positive on July, 12, 2021.[23]  Their vaccination status is unknown.

      B.   <u>Mr. Cheatham is more likely to get severely ill from COVID-19.</u>

The CDC states that "[l]ong-standing systemic health and social inequities have put people from many racial and ethnic minority groups at increased risk of getting sick and dying from COVID-19. Studies have shown minority groups are also dying from COVID-19 at younger ages."[24]  In addition, the CDC explicitly states that "[l]iving in prisons and jails puts you at higher risk for getting COVID-19" because of the difficulty in taking preventive measures in such settings.[25]

Mr. Cheatham is a 35-year-old African American male confined to a federal prison.  Courts have found that a person's race can increase the risk of complications from COVID-19.  *See United States v. Smith*, 2021 WL 259504, at *3 (E.D. Va. Jan. 20, 2021) (finding that race is an additional factor weighing in favor of extraordinary and compelling circumstances based on the CDC's finding that "systemic health and social inequities have put many people from racial groups at an increased risk of severe illness from COVID-19 and "increased risk of dying from COVID-19.").

Mr. Cheatham also suffers from asthma and has had two asthma attacks in the past decade.  PSR ¶ 57, and Exhibit B—BOP Health Services Clinical Encounter 3/16/21 (filed under seal).

---

[23] Fed'l Bur. of Prisons, *Press Release: Inmate Death at FMC Forth Worth*, available at: https://www.bop.gov/resources/news/pdfs/20210803_press_release_ftw.pdf (Aug. 3, 2021); *Fed'l Bur. of Prisons, Press Release: Inmate Death at FCI Texarkana*, available at: https://www.bop.gov/resources/news/pdfs/20210803_press_release_tex.pdf (Aug. 3, 2021).

[24] CDC, Medical Conditions (March 29, 2021), available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[25] CDC, *People living in prisons and jails*, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/living-prisons-jails.html (last updated March 5, 2021).

```
COMPLAINT  1        Provider:  Bias, A. FNP
Chief Complaint:  PULMONARY/RESPIRATORY
Subjective:  34 y/o male reports dyspnea and cough; "I can't catch my breath, I need my inhaler back".
             Inmate reports shortness of breath, nasal stuffiness, and dry cough. Inmate also reports
             seasonal allergies exacerbated by exposure to pollen; reports sneezing, tightness in chest,
             and itchy/watery eyes. Inmate reports occasional wheezing and coughing at night time with
             last occurrence on Saturday night. Inmate denies fever, chills, pharyngitis , or fatigue.
Pain:        No
```

The CDC lists asthma as an underlying medical condition that makes one "more likely to be hospitalized from COVID-19."[26] "COVID-19 is a respiratory disease caused by a coronavirus. That means it can affect your lungs, throat, and nose. For people who have asthma, infection with the virus could lead to an asthma attack, pneumonia, or other serious lung disease."[27]

C. The fact that Mr. Cheatham declined the vaccine does not foreclose compassionate release.

Certainly, the arrival and proliferation of the vaccine in the country and within the Bureau of Prisons presents a glimmer of hope in what has been a devastating pandemic. However, in light of the messaging failures surrounding the safety of the two main COVID-19 vaccines in this country, vast swaths of the civilian population have declined the vaccine, including a sizeable proportion of medical workers, as "[e]fforts to disseminate Covid-19 vaccines as widely as possible are hitting an unexpected obstacle: health-care workers who decline the shots."[28] "The hesitancy among health-care workers concerns public-health officials who expected America's front-line workers to serve as a model for others."[29] Such widespread public distrust in the two vaccines, which were approved on an emergency

---

[26] CDC, *People with moderate to severe asthma*, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last updated April 7, 2021).

[27] Keri Wiginton, *Coronavirus and asthma*, (Apr. 19, 2021), available at: https://www.webmd.com/asthma/covid-19-asthma

[28] Julie Wernau, *Some Health-Care Workers Are Still Saying No to a Covid-19 Vaccine*, Wall Street Journal (Jan. 31, 2021), https://www.wsj.com/articles/some-health-care-workers-are-still-saying-no-to-a-covid-19-vaccine-11612089020.

[29] *Id.*; *see also* Megan Cerullo, *Many health care workers are refusing to get a COVID-19 vaccine*, CBS News (Jan. 19, 2021), https://www.cbsnews.com/news/covid-vaccine-health-care-worker-

basis only, is seen in BOP staff as well. On March 18, 2021, BOP Director Michael Carvajal testified before the House Committee on Appropriations that 51 percent—*over half*—of BOP staff have *turned down* the vaccine.[30]

Given that vaccine refusal is common even among high-exposure front-line health care workers and BOP staff, this Court cannot fault inmates for this country's broader public health failures. Mr. Cheatham, isolated in a federal prison with frequent lockdowns and quarantines, has little access to outside resources to make an informed decision on the pros and cons of the vaccine.[31] The FDA Emergency Use Authorization for the Pfizer vaccine explicitly states that it "is not an FDA-approved vaccine," as does the authorization for the Moderna vaccine.[32] Unlike those of us in the community, inmates are powerless to further educate themselves on what an "unapproved vaccine" means by following the internet links for further information on these fact sheets, if they receive them at all. Because it is common knowledge that many correctional officers and BOP staff are refusing

---

reluctance/ ("A significant percentage of doctors, nurses, EMS workers, support staff and other health care employees said they turned down the Pfizer-BioNTech and Moderna vaccines over concerns they may not be safe or effective.").

[30] *COVID Outbreaks and Management Challenges: Evaluating the Federal Bureau of Prisons' Pandemic Response and the Way Forward, Before the Subcomm. on Commerce, Justice, Science, and Related Agencies*, 117th Congress (March 18, 2021) (statement of Michael Carvajal, Director of the Bureau of Prisons); available at: https://appropriations.house.gov/events/hearings/covid-outbreaks-and-management-challenges-evaluating-the-federal-bureau-of-prisons, at 55:00.

[31] *See* Laura Crimaldi, *Prison, Jail Inmates Are Starting to Receive COVID-19 Vaccines. Some are Passing on the Offer*, Boston Globe (Jan. 22, 2021), https://www.bostonglobe.com/2021/01/22/nation/prison-jail-inmates-are-starting-receive-covid-19-vaccines-some-are-passing-offer/ (reporting that inmates at MCI Norfolk were only given 30 minutes to review written materials before being administered the vaccine and did not answer inmates' questions).

[32] *See* Exh. 4; *see also* FDA, *Fact Sheet for Recipients and Caregivers, Emergency Use Authorization of the Moderna COVID-19 Vaccine*, https://www.fda.gov/media/144638/download; FDA, *Fact Sheet For Healthcare Providers Administering Vaccine, Emergency Use Authorization (EUA) Of The Pfizer-Biontech Covid-19 Vaccine*, https://www.fda.gov/media/144413/download.

the vaccine, this only adds more fear and doubt for inmates. And incarcerated people have reason to be skeptical of what is described as an "unapproved" vaccine in FDA literature.[33]

Even among the general public, there is a great deal of misinformation about the COVID-19 vaccine, and that information can easily find its way to incarcerated people. For instance, there are media accounts pertaining to the "Vaccine Adverse Reporting System" (VAERS), which is a public database that keeps track of side effects for vaccines.[34] As of March 26, 2021, there were 233,394 reports in VAERS, including 1,785 reports of death.[35] Experts emphasize that there are shortcomings to this data; for instance, just because something is reported does not mean it is connected to the vaccine. "When you see the numbers from VAERS, they are following vaccination, but not necessarily caused by vaccination," a doctor explained. In fact, "to date, VAERS has not detected patterns in cause of death that would indicate a safety problem with COVID-19 vaccines."[36] So, while VAERS reports are misleading, it is certainly understandable how such reports can raise concern and alarm.

Given the widespread mistrust and misinformation about the COVID-19 vaccine, particularly in light of the fact that over half of BOP staff who have been offered the vaccine have refused to take it, it is understandable why Mr. Cheatham would have concerns and questions. In fact, Mr. Cheatham reports that the staff member who offered him the vaccine told him that he would not be taking the vaccine himself. He also heard it may cause sterility. This has been a common piece of misinformation,

---

[33] FDA, *Fact Sheet for Recipients and Caregivers*, (Revised: June 25, 2021), available at: https://www.fda.gov/media/144414/download

[34] Eliana Block, *VERIFY: The VAERS database alone isn't evidence that COVID vaccines are causing deaths and miscarriages* (April 6, 2021), available at: https://www.wusa9.com/article/news/verify/cdc-vaers-reporting-vaers-website-does-covid-vaccine-cause-miscarriages-vaers-database-fact-check-vaers-reports-death-miscarriage-doesnt-mean-covid/65-c0a96de2-b86b-4479-a21f-4b6a453d88ac.

[35] *Id.*

[36] *Id.*

and it is not surprising that it has spread to prisons.[37] Mr. Cheatham also suffers from allergies and could never obtain an assurance that his allergies would not conflict with the vaccine. For Mr. Cheatham, this was not an unreasonable concern as he is allergic to two common medication ingredients, Ceclor and Iodine *See* Exhibit C—Medical Records (Allergies) (filed under seal). Further, Mr. Cheatham is not generally averse to vaccines. In the past two years, Mr. Cheatham has received two vaccines, Influenza and Pneumovax 23. *See* Exhibit D—Medical Records (Immunizations) (filed under seal). Moreover, courts have granted compassionate release despite a defendant's refusal to take the vaccine. *See United States v. Rahman*, Case No. 2:11cr20540, Dkt. Nos. 726 and 733 (E.D. Mich. March 15, 2021); *United States v. Gordon*, Case No. 1;14cr10304, Dkt. Nos. 619 and 621 (D. Mass. Feb. 26, 2021).

Further, while vaccination is an important means of protection, it is not a panacea. Accordingly, courts have granted compassionate release to defendants who have been vaccinated, noting the risk of new variants and other unknowns about the efficacy of the vaccine.[38] A court in this District recently granted compassionate release to 48-year-old defendant with a history of smoking, hypertension, and latent tuberculosis infection, based on the fact that his prior COVID-19

---

[37] Geoff Brumfiel, *The Life Cycle of a COVID-19 Vaccine Lie* (July, 20, 2021), available at: https://www.npr.org/sections/health-shots/2021/07/20/1016912079/the-life-cycle-of-a-covid-19-vaccine-lie

[38] *United States v. White,* 2021 WL 268719, at *4 (M.D. Tenn. Jan. 27, 2021) (granting compassionate release and noting new COVID-19 variants can evade vaccine-induced immunity); *United States v. Hernandez-Sandoval*, Case No. 3:14cr5105, Dkt. No. 617, at *8 (W.D. Wash. Feb. 22, 2021) (granting compassionate release to a defendant with serious underlying medical conditions who had already contracted COVID-19 and received the first dose of the COVID-19 Moderna vaccine); *United States v. Manglona*, Case No. 3:14cr5396, Dkt. No. 205, at *3 (W.D. Wash. Mar. 3, 2021) (granting compassionate release to a defendant who received both doses of the COVID-19 vaccine, noting: "Risk appears to remain, but it is reduced to an unknown degree. The Court's conclusion is that vaccination during the pendency of the Motion for Compassionate Release [ ] should not, and does not, in some way trump the Court's consideration of the motion.").

infection may not provide immunity from reinfection from COVID-19 or COVID-19 variants. *United States v. Everett*, Case No. 1:05cr19, Dkt. No. 288, at *3 (E.D. Va. Feb. 24, 2021).

Mr. Cheatham should not be penalized for the choice he made given his limited access to reliable materials regarding the vaccine and its safety, and especially given that healthcare workers and BOP staff across the country are making the same decision. Extraordinary and compelling reasons exist for his release, and compassionate release is necessary to protect his health and safety and to ensure that his sentence complies with the § 3553(a) factors and current law.

## III. A Sentence Reduction Is Necessary to Avoid Unwarranted Sentencing Disparities.

If Mr. Cheatham were sentenced for these same crimes today, his period of incarceration would likely be much shorter than 235 months.

### A. Mr. Cheatham's sentencing guidelines would be lower if he were sentenced today.

In light of the Fourth Circuit's decision in *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), a court in this District has found that a subsequent change in the guideline range may be considered in a motion for compassionate release under § 3582(c)(1)(A)(i). *See United States v. Spencer*, Case No. 2:11cr30, ECF No. 130 at *8 (E.D. Va. Feb. 24, 2021) (considering a subsequent change in law that would no longer make the defendant a career offender and would result in a lower guideline range, and finding that district courts have "discretion to consider the severity of defendants' sentences and the extent of the disparity between the defendants' sentences and those provided under current law when deciding a motion for compassionate release.") (internal quotation omitted).

This Court should consider that if sentenced today for the same conduct, Mr. Cheatham's guideline range would be lower. This is because Amendment 782 went into effect on November 1,

2014,[39] after Mr. Cheatham was sentenced. Specifically, as applied to Mr. Cheatham, this amendment would reduce his offense level by two levels.

At sentencing, Mr. Cheatham was attributed with at least 100 KG but less than 400 KG of converted drug weight, resulting in a base level of 26. *See* PSR Worksheet A, at 30. Today, the base offense level for the same drug weight would result in a base level of 24. *See* USSG § 2D1.1(c)(8). Therefore, if sentenced for the same offense today, the applicable guideline range would be 121-151 months, instead of 151-188 months—the low end of his guidelines would be 30 months less. This is significant because Mr. Cheatham's guidelines were driven by the drug offense, not the robbery. *See* PSR Worksheet A, at 28. Since Mr. Cheatham was sentenced at the low end of the guidelines, is it therefore reasonable to conclude that if the guideline range were 121-151 months, he would have received 121 months on counts 1 and 5, not 151 months.

Additionally, this Court should consider that Mr. Cheatham was not granted a two-point reduction for acceptance of responsibility, even though he pled guilty to two counts of the indictment. The Fourth Circuit has explicitly rejected the "all or nothing" approach to acceptance of responsibility. Thus, a criminal defendant may receive credit for acceptance of responsibility if he pleads guilty to some but not all convicted offenses. *See United States v. Nale*, 101 F.3d 1000, 1005 (4th Cir. 1996); *See also U.S. v. Hargrove*, 478 F.3d 195, 205 (4th Cir. 2007). And significantly, Mr. Cheatham pled guilty to the two most serious charges—Interference with Commerce by Robbery and Possession with Intent to Distribute Schedule II Controlled Substance. PSR ¶ 4. If Mr. Cheatham was granted acceptance, his offense level would have been reduced an additional two points, resulting in an offense level of 28 putting his sentencing range today at 97-121 months.

B. **924(c) minimums may now be considered in calculating a just sentence.**

---

[39] *See* United States Sentencing Guidelines, Amendment 782 (enacted November 1, 2014), available at https://www.ussc.gov/guidelines/amendment/782 (last visited August 5, 2021).

Finally, district courts are free to consider the mandatory minimum sentence imposed under § 924(c) when calculating a just sentence for the predicate counts. *Dean v. United States*, 137 S. Ct. 1170, 1178 (2017). In *Dean*, the defendant argued, "that the court should consider his lengthy mandatory minimum sentences when calculating the sentences for his other counts, and impose concurrent one-day sentences for those counts." *Id.* The Court held that "[n]othing in the language [of §924(c)] prevents a district court from imposing a 30-year mandatory minimum sentence under §924(c) and a one-day sentence for the predicate violent or drug trafficking crime, provided those terms run one after the other." *Id.*

Mr. Cheatham is serving a 151-month sentence, with 84 months to run consecutively for his § 924(c) conviction. At the time of his conviction, the sentencing court did not have the benefit of the Supreme Court's decision in *Dean*, which now allows courts to consider the impact of the mandatory minimum under § 924(c) when calculating the total sentence. Had Mr. Cheatham been sentenced for these offenses today, this Court would be on sound legal footing to sentence him to as little as one day on the robbery and drug charges, plus 84 months on the § 924(c).

Mr. Cheatham has now been incarcerated for 107 months and has served the mandatory minimum plus 23 months. The lower end of his guidelines for the predicate offenses today would be 97 months if he was granted acceptance of responsibility, 121 months if not. Either way, if Mr. Cheatham were sentenced today, his sentence would almost certainly be lower. Plus, given his young age at the time of the offense, it is likely this Court would consider the harsh § 924(c) mandatory minimum when imposing a sentence for the predicate offenses. Given the changes in the law, a sentence reduction is warranted.

## IV.     Mr. Cheatham's Release is Consistent with the Remaining § 3553(a) Factors.

Where there are "extraordinary and compelling reasons," a "court . . . may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions

that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable." § 3582(c)(1)(A). Under § 3582(c), the default presumption is that the court cannot modify a previously imposed term of imprisonment, unless the defendant presents extraordinary and compelling reasons that warrant such a reduction. Once the defendant makes that showing, however, "the presumption then effectively shifts in favor of his release, and the court must determine whether any of the purposes of punishment set forth in section 3553(a) require keeping the defendant incarcerated nevertheless; that is, notwithstanding the extraordinary and compelling circumstances that would otherwise justify releasing him." *United States v. Greene*, 2021 WL 354446, at *16 (D.D.C. Feb. 2, 2021).

A. <u>The underlying offense and Mr. Cheatham's history and characteristics support the relief requested.</u>

Prior to committing the robbery, Mr. Cheatham was a man of substantial character and accomplishment. Mr. Cheatham earned 71 collegiate credit hours with a major in Industrial Education and Technology. PSR ¶ 66. Mr. Cheatham was devoted to his studies and was a joy for others on campus to be around. *See* Exhibit E—Letter from Amanda Harrison and Exhibit F—Letter from Kenya Rawlings. However, Mr. Cheatham's life changed drastically in 2004 when his sister committed suicide and then his father was diagnosed with cancer shortly thereafter. PSR ¶ 52. While still grieving the tragic suicide of his sister, Mr. Cheatham was prescribed Percocet for an injury in 2005. PSR ¶ 62. He became addicted within two years. *Id.* And leading up to his arrest in 2013, Mr. Cheatham was struggling significantly with his Percocet addiction. *Id.* At the time of his arrest, he was taking 15 to 20 pills a day. *Id.* And on May 4, 2012, Mr. Cheatham was diagnosed with Percocet abuse. PSR ¶ 63.

In May 2012, Mr. Cheatham began taking steps to overcome his addiction. Mr. Cheatham saw a doctor and requested to get on the suboxone program. PSR ¶ 64. Unfortunately, the drug treatment failed and a few months later, Mr. Cheatham was arrested for the instant robbery. PSR ¶ 1. Mr. Cheatham was just twenty-six years old when he committed the crime.

Even with all the hardship Mr. Cheatham has faced, he takes full responsibility for his actions: "No substances, childhood trauma, friends or environment made me make a decision that ultimately ruined not only my own life but my families as well." *See* Exhibit G—Letter from Mr. Cheatham.

B. <u>Mr. Cheatham is a far different person, as he comes before the Court today.</u>

In evaluating a motion for compassionate release, the Court is not simply reweighing the sentencing factors as they existed at the time of sentencing. Rather the Court has full discretion to determine whether there are "extraordinary and compelling reasons" for release, and it *must* consider post-offense developments under 18 U.S.C. § 3553(a), which provide "the most up-to-date picture" of Mr. Cheatham's history and characteristics. *See Pepper v. United States*, 562 U.S. 476, 490-93 (2011). Rehabilitation, considered with other equitable factors, can establish extraordinary and compelling reasons to justify the granting of compassion release. *See United States v. Cantu-Rivera*, No. CR H-89-204, 2019 WL 2578272, at *2 (S.D. Tex. June 24, 2019) (granting compassionate release for defendant with extraordinary degree of rehabilitation); *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at *10 (S.D.N.Y. Apr. 6, 2020).

In *Millan*, the court states:

> Mr. Millan's extraordinary rehabilitation, together with his remorse and contrition, his conduct as model prisoner and man of extraordinary character, his leadership in the religious community at FCI Fairton, his dedication to work with at-risk youth and suicide prevention, and the support of BOP staff at FCI Fairton, including their opinion that if released, Mr. Millan would be a productive member of society and no danger to others, and the sentencing disparity that would result from further incarceration all constitute extraordinary and compelling reasons justifying a reduction in sentence. *Id.*

Like Mr. Millan and Mr. Cantu-Rivera, Mr. Cheatham has undergone an extraordinary process of rehabilitation. Mr. Cheatham has been incarcerated for 107 months; accounting for good time, he has served approximately 45 percent of his sentence. He has spent a substantial portion of his sentence

in prison during the deadly coronavirus pandemic, which has amplified the punitive aspects of imprisonment at the expense of the rehabilitative components. The continued proliferation of the virus within federal prisons has not only put Mr. Cheatham's health directly at risk, but it has also increased the punitive nature of what is already a severe sentence. In this vein, courts have recognized that as prison conditions get harsher, sentences should get shorter. *See United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) (finding merit to the argument that "the harsher the conditions, the shorter the sentence should be."). In accordance with this reasoning, courts have found prison conditions during the pandemic to be a factor in granting compassionate release and in imposing lower sentences.[40]

Nevertheless, Mr. Cheatham has embodied the rehabilitative mission that the BOP struggles



to uphold. Mr. Cheatham has maintained a full-time work assignment since his arrival at FCI Pollock. *See* Exhibit H—Summary Reentry Plan-Progress Report. Mr. Cheatham began taking advantage of every rehabilitative program he could as soon as he was incarcerated. In March 2014, Mr. Cheatham completed his GED. *Id.* Mr. Cheatham has completed four drug classes. *Id.* And Mr. Cheatham has completed an astonishing ***forty-two education courses***. *Id.* Mr.

---

[40] *See United States v. Indarte*, 2020 WL 6060299, at *4 (W.D. Wash. Oct. 14, 2020) ("[T]he factor relating to 'the need for just punishment' has dramatically shifted since sentencing. The lockdown measures in prisons across the country like [Coleman II USP] have undergone to mitigate the spread of the pandemic have made confinement much more punitive than was contemplated at sentencing. . . This factor has much greater weight when balancing it with the other factors and when considering how much of his sentence [the defendant] has served."); *United States v. Olawoye*, 2020 WL 4559816, at *5 (D. Or. Aug. 7, 2020) ("The sentence the defendant has served has undoubtedly been harsher than the one originally contemplated at the time of sentencing."); *United States v. Armstrong*, 2020 WL 4366015, at *4 (S.D. Cal. July 30, 2020) ("[T]he Court is aware that defendants committing similar offenses now, in the time of COVID-19, are receiving vastly lower sentencing recommendations because their time in custody is harsher. . . Therefore, the Court finds reducing [the defendant's] sentence would also avoid unwarranted disparities between similarly situated defendants.").

Cheatham has shown a tremendous commitment to his dream of opening a gym when he is released by completing nineteen courses about business management. *Id. See also* Exhibit I- CTCC Business Classes. As of March 2021, Mr. Cheatham has not incurred a disciplinary infraction for five and a half years. *Id.* In addition to gaining skills for his own personal development, Mr. Cheatham has completed multiple courses on parenting with the goal of becoming a better father to his two young children. *Id.* These skills are the ones most important to Mr. Cheatham: "I still have held on to my faith and strength for my two children who are everything that's good in me, they make me want to be the best version of me." *See* Exhibit G—Letter from Mr. Cheatham.

Education remains especially important to Mr. Cheatham. On August 2, 2021, undersigned counsel spoke with Mr. Cheatham's business technology teacher Atina Wright, who contracts with the BOP through her position at Central Louisiana Technical Community College. When asked, Ms. Wright explained that she was unable to write a letter on his behalf as she is a contract worker for the BOP. However, she said Mr. Cheatham is in good academic standing and has been "an outstanding student from day one." These words speak volumes to Mr. Cheatham's commitment to continuing to better himself through education.

Mr. Cheatham has received numerous certificates while incarcerated – too many to list here. *See* Exhibit J- various BOP certificates. He has also had his rights restored from the Governor. *See* Exhibit K- letter of restoration of rights. While he is not permitted to possess a firearm, he will be free to vote for our next president and sit on a jury upon his release. This initiative shows how desperately Mr. Cheatham longs to be a contributing member of society.

And when Mr. Cheatham is not working or completing courses, he spends much of his time reading and sharing books with fellow inmates. *See* Exhibit L—Letter from Audra Green. He has not been causing trouble while incarcerated, nor getting into fights. Instead, he has been taking education courses, reading, and focusing all of his energy towards rehabilitation. While the conditions of his

incarceration during a pandemic have been unimaginably difficult, Mr. Cheatham has remained a model inmate and has set a near-perfect example for other inmates on how to focus on rehabilitation. "I can tell he has not been broken by this time spent in prison but instead has gained a strong focus for who he is and wants to be. I am proud of him." *Id.* Joenique Cameron, the president of the Queenly Foundation, writes, "I have never known anyone so committed to personal growth in my life." *See* Exhibit M—Letter from Joenique Cameron. And Kenya Rawlings writes, "He is devoted to be an agent of change and is ready to uncover his true potential and lead a life worth celebrating."



If released from incarceration, Mr. Cheatham has the opportunity to become an 'agent of change.' Mr. Cheatham has a stable and viable release plan that will aid in his transition into the community. Mr. Cheatham plans to live with his mother, Sheila Mays, at her home in Richmond, Virginia. Additionally, Mr. Cheatham has an offer of employment from Brewer's Café in Richmond and will accept this offer upon his release. *See* Exhibit N—Letter from Ajay Brewer. Mr. Brewer also runs a nonprofit that supports inner-city youth that would greatly value Mr. Cheatham's presence and participation. *Id.* Mr. Cheatham also enjoys great support from his community. *See* Exhibit Q—Character letters.

Finally, Mr. Cheatham is desperately needed at home. He has two children, ages 14 and 10. Both children have missed the opportunity to grow up with their father. The oldest child suffers from emotional separation anxiety and deeply misses his father in his life. *See Exhibit* O—Letter from Shavon Ragsdale and Exhibit P—Letter from Mr. Cheatham's children. The mother of his 14-year-old attests to Mr. Cheatham's good qualities. And she is extremely worried about the well-being and future of her child. *See* Exhibit O—Letter from Shavon Ragsdale. Mr. Cheatham has devoted countless

hours in prison towards working to become a better parent. And Mr. Cheatham states that his children are the reason he holds faith and continues his path towards rehabilitation. *See* Exhibit G—Letter from Marcellus Cheatham. Granting his motion for compassionate release will allow him to be reunited with his children while he can still have a positive impact on their upbringing.

## CONCLUSION

Mr. Cheatham has spent nine long years behind bars, none longer than the last 16 months. Despite these challenges, he has excelled and worked tirelessly to rehabilitate himself. For all of the reasons outlined above, Mr. Cheatham respectfully requests that this Court order his immediate release, or in the alternative, substantially reduce his sentence to reflect the changes in the law since his sentencing.

Respectfully submitted,

MARCELLUS CHEATHAM

_____/s/_____
Amanda C. Conner
Virginia State Bar No. 88317
Office of the Federal Public Defender
Counsel for Mr. Marcellus Cheatham
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: 757-457-0816
Fax: 757-457-0880
amanda_conner@fd.org

**CERTIFICATE OF SERVICE**

I certify that on this 5th day of August, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification (NEF) to all counsel of record.

I further certify that I sent a copy of this pleading to the probation office by way of electronic mail to: duty-vaep-norfolk@vaep.uscourts.gov.

_____/s/_____
Amanda C. Conner
Virginia State Bar No. 88317
Office of the Federal Public Defender
Counsel for Mr. Hafeez Odoffin
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: 757-457-0816
Fax: 757-457-0880
amanda_conner@fd.org
